[Cite as *Blus v. Civista Bank*, 2025-Ohio-3303.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Kathleen Blus, et al.

    Appellant

v.

Civista Bank

    Appellee

Court of Appeals No. E-24-029/E-24-030

Trial Court No. 2022CV0094/2023CV0070

**<u>DECISION AND JUDGMENT</u>**

Decided: September 12, 2025

* * * * *

Shawn K. Judge and Mark H. Troutman, for appellants.

Drew H. Campbell, Jessica Bainbridge, and
Matthew D. Gurbach, for appellee.

* * * * *

**DUHART, J.**

{¶ 1} This is a consolidated appeal from the judgment of the Erie County Court of

Common Pleas granting appellee's, Civista Bank, motion for summary judgment on

appellants', Kathleen Blus and David Johnson, complaints for breach of contract and unjust enrichment. For the reasons that follow, the trial court's judgment is affirmed.

**Statement of the Case and the Facts**

{¶ 2} The following facts are undisputed. Kathleen Blus and David Johnson both had checking accounts with Civista Bank, each subject to two separate contractual agreements: the "2018 Agreement" and the "2020 Agreement."

{¶ 3} On March 30, 2020, and April 29, 2020, Blus was assessed "NSF Fees" of $35 for insufficient funds related to debit card transactions that she made earlier. Blus alleges that she had sufficient funds in her account at the time that she made the debit card transactions but did not have sufficient funds when the transactions "settled." The same thing happened to Johnson on August 15, 2016.

{¶ 4} Separately, Johnson was charged NSF Fees of $33 on September 12, 2016, and February 28, 2017, for transactions that were resubmitted by the merchant for payment after the initial transactions were returned and without his request to reprocess the transactions.

{¶ 5} Blus and Johnson each filed class action complaints against Civista Bank on behalf of themselves and all others similarly situated. Both complaints asserted a claim for breach of contract—including breach of the implied duty of good faith and fair dealing—and a claim of unjust enrichment. Blus's breach of contract claim alleged solely that Civista Bank breached the contracts when it charged her NSF Fees for transactions that did not overdraw the account at the time they were made, referred to as

2.

the "Authorize Positive, Purportedly Settle Negative" ("APPSN") theory. Johnson's breach of contract claim included the APPSN theory but also added an argument that Civista Bank breached the contracts when it assessed NSF Fees for resubmitted "items," referred to as the "Multiple Fee" theory.[1]

{¶ 6} Upon the joint request of the parties, the trial court consolidated the two actions.

{¶ 7} Thereafter, Civista Bank moved for summary judgment, arguing that the 2018 Agreement and the 2020 Agreement unambiguously authorized it to assess the NSF Fees against Blus and Johnson. Blus and Johnson, in opposition, argued that the agreements were ambiguous and thus summary judgment was not appropriate.

{¶ 8} On April 25, 2024, the trial court entered its judgment granting summary judgment in favor of Civista Bank.

{¶ 9} Regarding the APPSN theory, it reasoned that both the 2018 Agreement and the 2020 Agreement "unambiguously provide that a customer will not have access to his or her funds immediately; that the available balance can be less than the actual balance on a customer's account; and that the NSF or [Overdraft] Fee may be charged when the available balance in the account is insufficient to cover the item presented." In particular, the trial court rejected Blus and Johnson's argument that the NSF determination is made

---

[1] It is unclear to this court why Johnson is suing for breach of the 2018 and 2020 Agreements when Civista Bank's imposition of the NSF Fees occurred in 2016 and 2017. Nevertheless, this issue is not raised by the parties so we will decline to address it.

3.

at the time of authorization, not payment. The trial court also rejected Blus and Johnson's further argument that Civista Bank was required to "sequester" funds relating to specific authorization holds. Thus, the trial court held that Civista Bank did not breach the agreements when it assessed the NSF Fees.

{¶ 10} Turning to the Multiple Fee theory, the trial court first noted that Johnson pursued his claim only under the 2018 Agreement. It, therefore, granted summary judgment to Civista Bank relative to the Multiple Fee theory branch of Johnson's claim for breach of the 2020 Agreement. As to the 2018 Agreement, the trial court rejected Johnson's argument that the NSF Fee can only refer to a single order or instruction for payment. Its reasoning relied, in part, on the National Automated Clearing House Association Rules ("NACHA Rules"), which were incorporated into the 2018 Agreement. The trial court held instead that Civista Bank did not breach the 2018 Agreement when it charged an NSF Fee each time an item was resubmitted for payment.

{¶ 11} The trial court next considered Blus and Johnson's claim that Civista Bank breached the implied covenant of good faith and fair dealing. It concluded that because Civista Bank performed in accordance with the agreements and did not breach any terms of the agreements, the claim for breach of the implied covenant of good faith and fair dealing must fail.

{¶ 12} Finally, as to Blus and Johnson's claim for unjust enrichment, the trial court held that because the parties entered into a contract expressly covering the same subject matter, the unjust enrichment claim must fail as a matter of law.

4.

## Assignments of Error

{¶ 13} Blus and Johnson each timely appealed the April 25, 2024 judgment of the Erie County Court of Common Pleas. This court consolidated their appeals, and they filed a joint brief. For ease of discussion, we will hereafter refer to Blus and Johnson collectively as "appellants."

{¶ 14} Appellants assert five assignments of error for our review:

1. The trial court erred in holding that the 2018 and 2020 Agreements unambiguously permit Civista to charge overdraft fees on APPSN Fees.

2. The trial court erred in granting summary judgment on a multiple fee claim under the 2020 Agreement when Appellants never pleaded a multiple fee claim under the 2020 Agreement.

3. The trial court erred in holding that the 2018 Agreement unambiguously permits Civista to charge multiple fees on a single item.

4. The trial court erred in holding that Appellants' claims for breach of the covenant of good faith and fair dealing failed.

5. The trial court erred in holding that Appellants' unjust enrichment claims failed as a matter of law.

## Law and Analysis

## Standard of Review

{¶ 15} Appellate courts review summary judgment de novo, employing the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996); *Thorne v. Toledo*, 2024-Ohio-5308, ¶ 16 (6th Dist.). Summary judgment is appropriate when the moving party demonstrates:

(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.

*Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978).

{¶ 16} The issues in this case turn on the interpretation of the 2018 and 2020 Agreements. "The construction of a written agreement is a matter of law for the court." *LublinSussman Group LLP v. Lee*, 2018-Ohio-666, ¶ 19 (6th Dist.), citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus.

{¶ 17} In *Sutton Bank v. Progressive Polymers, L.L.C.*, 2020-Ohio-5101, ¶ 15, the Ohio Supreme Court summarized how agreements should be interpreted:

> Rules of contract interpretation are tools that we use to give meaning to disputed terms or provisions so that the contract as a whole will reflect the parties' intent. *See Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus. These rules can be broken down into two basic categories: primary interpretive rules and secondary interpretive rules. In all cases involving contract interpretation, we start with the primary interpretive rule that courts should give effect to the intentions of the parties as expressed in the language of their written agreement. *See Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37. Other primary interpretive rules assist the court in doing this by giving guidance on how to interpret the meaning of certain words. For example, one rule is that "[c]ommon words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus. Another more specific, but also at times very helpful, rule is that technical terms are to be given their technical meaning "unless a different intention is clearly expressed." *See Foster Wheeler Envirespose v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (1997). Other rules are secondary,

6.

rather than primary, interpretive tools and do not operate unless the primary rules of interpretation fail to resolve the contract's meaning. The rule that a contract provision should be strictly construed against one party and liberally construed in favor of the other—either due to the type of contract or contract provision at issue, inequality in bargaining power, or the fact that one party is the drafter and the other is not—is a secondary rule. *See Malcuit v. Equity Oil & Gas Funds, Inc.*, 81 Ohio App.3d 236, 239-240, 610 N.E.2d 1044 (9th Dist.1992). Accordingly, it does not come into play unless the intent of the parties cannot be deciphered because the contract language is reasonably susceptible of two different interpretations. *See id.*

### APPSN Theory

{¶ 18} In their first assignment of error, appellants argue that the trial court erred when it determined that the 2018 and 2020 Agreements unambiguously permit Civista Bank to charge overdraft fees on APPSN transactions.

### 2018 Agreement

{¶ 19} Appellants contend that the 2018 Agreement is ambiguous and lends itself to a reasonable interpretation that the bank promises its accountholders that when a debit hold is placed on a pending debit card purchase, the held funds will be used to pay for the transaction that causes the hold. In support, appellants cite Civista Bank's use of the word "hold," their contention that the agreement promises to determine overdrafts at the time of authorization, not settlement, and the ambiguity of the words "pay" and "payment."

{¶ 20} The 2018 Agreement provides, in relevant part:

> **A temporary debit authorization hold affects your account balance** – On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our

processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Here is an example of how this can occur – assume for this example the following: (1) you have opted-in to our overdraft services for the payment of overdrafts on ATM and everyday debit card transactions, (2) we pay the overdraft, and (3) our overdraft fee is $35 per overdraft, but we do not charge the overdraft fee if the transaction overdraws the account by less than $10.

You have $120 in your account. You swipe your card at the card reader on a gasoline pump. Since it is unclear what the final bill will be, the gas station's processing system immediately requests a hold on your account in the amount of $80, and the gas station's processing system authorizes you to begin pumping gas. You fill your tank and the amount of gasoline you purchased is only $50. Our processing system shows that you have $40 in your account available for other transactions ($120 - $80 = $40) even though you would have $70 in your account available for other transactions if the amount of the temporary hold was equal to the amount of your purchase ($120 - $50 = $70). Later, another transaction you have authorized is presented for payment from your account in the amount of $60 (this could be a check you have written, another debit card transaction, an ACH debit or any other kind of payment request). This other transaction is presented before the amount of the temporary hold is adjusted to the amount of your purchase (remember, it may take up to three days for the adjustment to be made). Because the amount of this other transaction is greater than the amount our processing system shows is available in your account, our payment of this transaction will result in an overdraft transaction. Because the transaction overdraws your account by $20, your account will be assessed the overdraft fee of $35 according to our overdraft fee policy. You will be charged this $35 fee according to our policy even

though you would have had enough money in your account to cover the $60 transaction if your account had only been debited the amount of your purchase rather than the amount of the temporary hold or if the temporary hold had already been adjusted to the actual amount of your purchase.

**Overdrafts –** You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

. . .

**CIVISTA BANK**
**CHECK PROTECT**
**CUSTOMER OVERDRAFT POLICY**

An insufficient balance can result from several events, such as: (1) the payment of checks, electronic funds transfers or other withdrawal requests; (2) payments authorized by you; (3) the return of unpaid items deposited by you; (4) bank service charges; or (5) the deposit of items which, according to the bank's Funds Availability Policy, are treated as not yet available or finally paid. We are not obligated to pay any item presented for payment if your account does not contain sufficient funds.
. . .

In the normal course of business, we generally pay items presented in a branch (over the counter transactions) or at an ATM first, then electronic transactions and then checks in serial number order, per the bank's policy. We reserve the right to change the order of payment without prior notice at any time to you or if we suspect fraud or possible illegal activity affecting your account. Also, please be aware that the order of item payment may create multiple overdraft items during a single banking day

for which you will be charged our Non-Sufficient Funds (NSF) item paid fee of $35 for each overdraft item paid.

. . .

**CIVISTA BANK**
**CONSUMER SCHEDULE OF FEES**
**The following charges may be assessed against your account if any apply.**
. . .
Non-Sufficient funds (NSF) item paid …………………..……$ 35.00
Non-sufficient funds (NSF) item returned un-paid …..……..$ 35.00
> An overdraft or non-sufficient funds (NSF) may occur on an account by check, in person or ATM withdrawal or by other electronic means.

{¶ 21} As a general matter, the 2018 Agreement is clear, and any reasonable consumer would expect, that when an item is presented for payment and there are insufficient available funds in the account, Civista Bank will charge an NSF fee—either an NSF item paid fee if it pays the item, or an NSF item returned unpaid fee if it does not pay the item.

{¶ 22} Appellants argue that this general principle is ambiguous regarding its application to the specific APPSN transactions. To demonstrate the ambiguity, they cobble together language from different parts of the agreement, as well as banking regulations not mentioned in the agreement, in support of three related propositions.

{¶ 23} First, they contend that a reasonable understanding of the term "hold" is that the funds are effectively sequestered. They state, "If funds are placed on hold immediately for authorized debit card transactions, and held until settlement, no overdraft can occur because there are sufficient 'available funds' to cover the transaction." While

10.

appellants correctly understand that when a hold is placed on the account it results in a reduction to the available balance, nothing in the agreement supports their subsequent conclusion that when a hold is placed "no overdraft can occur because there are sufficient 'available funds' to cover the transaction." This subsequent conclusion conflates the "hold" with the payment of the item. "Hold" and "payment" have different meanings.

{¶ 24} The "hold" referred to in the agreement is a "temporary debit authorization hold." The agreement informs the customer that the hold "may be more than the actual amount of your purchase," and "[t]his temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made." The fact that it is "temporary" and will "be adjusted" distinguishes it from Civista Bank's "payment" of the transaction out of the customer's account. Indeed, if the terms were synonymous, then the contemplation that the hold could be "adjusted" would be nonsensical since the funds would have already transferred from the customer's account to the merchant.

{¶ 25} Appellant's claim of ambiguity regarding the interplay between "hold" and "payment" also necessarily relies on their second proposition, which is that overdrafts are determined at the time of authorization, not settlement. They base this proposition on the general overdraft language that "[Civista Bank]" may, at our discretion, honor withdrawal requests that overdraw your account." Working backwards, appellants distort the plain language to suggest that since under federal banking regulations Civista Bank does not have discretion to pay authorized debit card transactions, then the decision to

"honor" withdrawal requests must occur at the time of authorization, not settlement.

Ironically, appellants' argument that a reasonable consumer would find the agreement ambiguous relies on federal banking regulations of which the typical customer would have no knowledge. Moreover, in arguing that the decision to "honor" withdrawal requests must occur at the time of authorization, appellants ignore the next few sentences in the overdraft language that equate "honor" with "pay." Indeed, the overdraft language states,

> However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us *to pay overdrafts* on your account regardless of how frequently or under what circumstances we *have paid overdrafts* on your account in the past. We can change our practice of *paying overdrafts* on your account without notice to you.

(Emphasis added.)

{¶ 26} In addition, the rest of the agreement repeatedly refers to NSF Fees being determined at the time the charge is "presented for payment." For example:

- If another transaction *is presented for payment* in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction *if we do not pay it* or an overdraft transaction *if we do pay it*. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy;
- Later, another transaction you have authorized *is presented for payment* from your account in the amount of $60 (this could be a check you have written, another debit card transaction, an ACH debit or any other kind of payment request);
- Because the amount of this other transaction is greater than the amount our processing system shows is available in your account, *our payment of this transaction* will result in an overdraft transaction;

12.

- We are not obligated *to pay any item presented for payment* if your account does not contain sufficient funds;
- In the normal course of business, we generally *pay* items presented in a branch (over the counter transactions) or at an ATM first, then electronic transactions and then checks in serial number order, per the bank's policy;
- Also, please be aware that the order of *item payment* may create multiple overdraft items during a single banking day for which you will be charged our Non-Sufficient Funds (NSF) *item paid* fee of $35 for each overdraft *item paid*;
- Non-Sufficient funds (NSF) *item paid*;
- Non-sufficient funds (NSF) *item returned un-paid*.

(Emphasis added.) Thus, contrary to appellants' argument, the 2018 Agreement clearly provides that overdrafts are determined at the time of settlement, i.e. when the item is paid by the bank, not authorization.

{¶ 27} Appellants' third proposition challenges this result by arguing that "pay" and "payment" do not unambiguously mean the settlement of a debit card transaction. Instead, appellants suggest that the "payment" occurs at the time of authorization. They argue that a reasonable customer would expect that something is "paid for" when he or she swipes the debit card, not when the bank's back-office operations are completed. While this is a fair expectation of a customer in his or her transaction with the merchant, it is completely divorced from the 2018 Agreement between the customer and the bank and the context in which "payment" is used.

{¶ 28} It is well-settled that "[i]n interpreting a provision in a written contract, the words used should be *read in context* and given their usual and ordinary meaning." (Emphasis added.) *Carroll Weir Funeral Home, Inc. v. Miller*, 2 Ohio St.2d 189, 192

13.

(1965). "Payment," while not defined in the agreement, commonly means the "[p]erformance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation," or "[a] disbursement of money." PAYMENT, Black's Law Dictionary (12th ed.2024). Thus, it connotes the actual transfer of money. Further, under the agreement provisions cited by appellants, "payment" is *always* used in the context of Civista Bank paying or making the payments. Thus, the term must mean when the transaction actually settles and funds are transferred by Civista Bank from the customer's account. It does not mean when appellants swipe their cards at a merchant.

{¶ 29} This brings us back to appellants' first proposition and the conflation between "hold" and "payment." If, as appellants suggest, payment occurs at the time of authorization, then the agreement's use of the term "hold" would be rendered meaningless, which is an interpretation we cannot abide. *See State ex rel. Casey v. Brown*, 2023-Ohio-2264, ¶ 46, quoting *Wohl v. Swinney*, 2008-Ohio-2334, ¶ 22 ("This court 'avoid[s] interpretations that render portions [of a contract] meaningless or unnecessary.'"); *American Eagle Invests., Inc. v. Marco's Franchising, LLC*, 2024-Ohio-3038, ¶ 39 (6th Dist.) ("In interpreting a contract, a court must avoid any interpretation that would render terms or provisions superfluous or meaningless." (Quotations omitted.)).

{¶ 30} In sum, the plain and unambiguous terms of the 2018 Agreement provide that when a Civista Bank customer swipes his or her debit card at a merchant and the

14.

transaction is authorized, a temporary hold is placed on the customer's account. The funds are not paid out of the account, however, until the time of settlement at which point the NSF Fee assessment occurs. Civista Bank clearly sets forth the order of payment to be, generally, "items presented in a branch (over the counter transactions) or at an ATM first, then electronic transactions and then checks in serial number order, per the bank's policy," and an NSF Fee is assessed whenever "the payment of checks, electronic funds transfers or other withdrawal requests, [or] payments authorized by [the customer]" exceeds the available balance. Therefore, the 2018 Agreement unambiguously authorizes Civista Bank to impose an NSF Fee on debit card transactions that authorize into a positive balance but settle into a negative balance.

{¶ 31} In support of their argument otherwise, appellants cite numerous decisions from various other state appellate and trial courts, federal appellate and trial courts, and one Ohio trial court decision from Licking County. *See, e.g., Roberts v. Capital One, N.A.*, 719 Fed.Appx. 33 (2d Cir. 2017). Each of those decisions determined that the agreements were ambiguous thereby precluding pretrial motions to dismiss or for summary judgment. Those decisions applied the same logic advanced by appellants and rejected above, however, and none of these decisions are binding precedent on this court. And while they analyzed similar contractual language, we do not find them persuasive relative to the specific, unambiguous language in this case.

{¶ 32} Additionally, the dissent argues that Civista Bank's explanation for why a reasonable customer should have known that a debit card transaction that creates a

temporary debit authorization hold could still result in NSF Fees is not the only

reasonable interpretation of the agreement.  The dissent describes Civista Bank's position

as:

> (1) the agreement, in various places, refers to NSF Fees being determined at
> the time the "item" is "presented for payment," which it claims is distinct
> from the time of "authorization;" (2) the agreement warns that "[a]n
> insufficient balance can result from several events," and states that the bank
> does not have to pay for "any item presented for payment" if the account
> contains insufficient funds; and (3) the agreement specifies an "order of
> payment" for all "items," which necessarily encompasses debit-card
> transactions—meaning that the timing of "payments" could result in
> insufficient funds for debit-card transactions and, therefore, fees.

The dissent proposes several "ambiguities and contradictions" that it believes could result

in a different reasonable interpretation.

{¶ 33} First, the dissent determines that the term "item" may not necessarily

include a debit card transaction.  The dissent suggests that the contract distinguishes

between "debit card transactions," "electronic transactions," and "items."  However, the

relevant language from the 2018 Agreement is not ambiguous and uses the term "item" to

refer to all manner of transactions that are presented to the bank for payment[2]:

> An insufficient balance can result from several events, such as:  (1)
> the payment of checks, electronic funds transfers or other withdrawal
> requests; (2) payments authorized by you; (3) the return of unpaid items
> deposited by you; (4) bank service charges; or (5) the deposit of items
> which, according to the bank's Funds Availability Policy, are treated as not

---

[2] The 2020 Agreement is likewise unambiguous.  Although it could be argued that
"items" and "transactions" have different meanings under that agreement, it very clearly
provides that both can give rise to NSF Fees:  "If a check, item or transaction is presented
without sufficient funds in your account to pay it, you will be charged an NSF or
overdraft fee according to our NSF or overdraft fee policy."

16.

yet available or finally paid. We are not obligated to pay *any item* presented for payment if your account does not contain sufficient funds.

. . .

In the normal course of business, we generally pay items presented in a branch[3] (over the counter transactions) or at an ATM first, then electronic transactions and then checks in serial number order, per the bank's policy. We reserve the right to change the order of payment without prior notice at any time to you or if we suspect fraud or possible illegal activity affecting your account. Also, please be aware that the order of item payment may create multiple overdraft *items* during a single banking day for which you will be charged our Non-Sufficient Funds (NSF) item paid fee of $35 for each overdraft item paid.

{¶ 34} Moreover, it is not reasonable to interpret the 2018 Agreement to exclude debit card transactions, electronic transactions, and—following the same logic—"checks" from the definition of "items," because to do so would directly contradict the provision describing the fees for NSF *items*:

Non-Sufficient funds (NSF) item paid ………………..……$ 35.00
Non-sufficient funds (NSF) item returned un-paid …..……..$ 35.00
An overdraft or non-sufficient funds (NSF) may occur on an account by *check, in person or ATM withdrawal or by other electronic means*.

Instead, the only reasonable interpretation is that "items" is a broad category of things presented to Civista Bank for payment, which includes, checks, ATM withdrawals, debit card transactions, and other electronic transactions.[4]

---

[3] Notably, this use of "items" cannot be separated from its modifier "presented in a branch," and thus does not support the proposition that a debit card transaction is not an item.

[4] Notably, the "**ELECTRONIC FUND TRANSFERS**" section of the agreement provides, "**Types of ATM/Debit Mastercard Point-of-Sale Transactions** – You may access your checking account(s) to purchase goods (in person, online, or by phone), pay

17.

{¶ 35} Next, the dissent asserts that "presented for payment" is undefined and ambiguous, and that a typical customer would likely interpret "presented for payment" as the moment he or she presents the debit card to pay for a transaction. As discussed above, this ignores the context in which "presented for payment" is used. In the relevant provisions of the 2018 Agreement, that phrase is always used in the context of items being presented to the bank. It is never used to describe the transaction between the customer and the merchant. Thus, the proposed ambiguity does not arise from the language used in the agreement, but rather from the out-of-context sense of what it means to "pay" for something. Consequently, appellants' and the dissent's alternative interpretation of "presented for payment" is not a reasonable one.

{¶ 36} Finally, the dissent agrees with appellants that a reasonable customer would interpret the provision that Civista Bank may, at its discretion, "honor withdrawal requests that overdraw your account," to mean that overdrafts occur at the moment the customer initiates a debit-card transaction and the bank "honors" the request by placing a "hold" on the account. The dissent states that "nothing in the contract unambiguously explains how the 'authorization' and 'settlement' process could result in fees for transactions that the bank has already 'honored.'" As discussed above, the dissent

---

for services (in person, online, or by phone), get cash from a merchant, if the merchant permits, or from a participating financial institution, and do anything that a participating merchant will accept." It is not argued that a debit card transaction is not an "electronic transaction."

imputes a different meaning to "honor" than is given in the agreement. In the context in which it is used, "honor" very clearly means "to pay":

> You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us *to pay* overdrafts on your account regardless of how frequently or under what circumstances we *have paid* overdrafts on your account in the past. We can change our practice of *paying* overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to *paying* overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us.

It is unreasonable for a customer who has read the contract to conclude that Civista Bank will make an NSF Fee determination when the debit card transaction is authorized. The 2018 Agreement consistently and unambiguously provides that the NSF Fee determination is made when the item is presented to the bank for payment.

{¶ 37} Therefore, we hold that the trial court did not err when it rejected appellants' APPSN theory and determined that Civista Bank acted in accordance with the 2018 Agreement when it assessed the NSF Fees.

## 2020 Agreement

{¶ 38} Appellants alternatively argue that the trial court erred when it awarded summary judgment to Civista Bank on their APPSN theory relative to the 2020 Agreement.

{¶ 39} The 2020 Agreement updated the terms and conditions found in the 2018 Agreement and included the following provisions:

19.

**UNDERSTANDING AND AVOIDING OVERDRAFT AND NONSUFFICIENT FUNDS (NSF) FEES –**

**Generally** – The information in this section is being provided to help you understand what happens if your account is overdrawn. Understanding the concepts of overdrafts and nonsufficient funds (NSF) is important and can help you avoid being assessed fees or charges. This section also provides contractual terms relating to overdrafts and NSF transactions.

An overdrawn account will typically result in you being charged an overdraft fee or an NSF fee. Generally, an overdraft occurs when there is not enough money in your account to pay for a transaction, but we pay (or cover) the transaction anyway. An NSF transaction is slightly different. In an NSF transaction, we do not cover the transaction. Instead, the transaction is rejected and the item or requested payment is returned. In either situation, we can charge you a fee.

If you use our Check Protect Overdraft Privilege Service and we cover a transaction for which there is not enough money in your account to pay, we will consider that an overdraft. We treat all other transactions for which there is not enough money in your account as an NSF transaction, regardless of whether we cover the transaction or the transaction is rejected.

**Determining your available balance** – We use the "available balance" method to determine whether your account is overdrawn, that is, whether there is enough money in your account to pay for a transaction. Importantly, your "available" balance may not be the same as your account's "actual" balance. This means an overdraft or an NSF transaction could occur regardless of your account's current balance.

Your account's current balance (sometimes called the ledger balance) only includes transactions that have settled up to that point in time, that is, transactions (deposits and payments) that have posted to your account. The current balance does not include outstanding transactions (such as checks that have not yet cleared and electronic transactions that have been authorized but which are still pending). The balance on your periodic statement is the ledger balance for your account as of the statement date.

Your available balance is calculated based on the money "available" in your account to make payments. The available balance takes transactions that have been authorized, but not yet settled, and subtracts them from the current balance. In addition, when calculating your available balance, any "holds" placed on deposits that have not yet cleared are also subtracted from the current balance. . . .

. . .

20.

**Nonsufficient funds (NSF) fees** – If an item drafted by you (such as a check) or a transaction you set up (such as a preauthorized transfer) is presented for payment in an amount that is more than the amount of money available in your account, and we decide not to pay the item or transaction, you agree that we can charge you an NSF fee for returning the payment. . . .

**Payment types** – Some, but not necessarily all, of the ways you can access the funds in your account include debit card transactions, automated clearing house (ACH) transactions, and check transactions. All these payment types can use different processing systems and some may take more or less time to post. This information is important for a number of reasons. For example, keeping track of the checks you write and the timing of the preauthorized payments you set up will help you to know what other transactions might still post against your account.

. . .

**A temporary debit authorization hold affects your account balance** – On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money when the merchant does not know the exact amount of the purchase at the time the card is authorized. The amount of the temporary hold may be more than the actual amount of your purchase. Some common transactions where this occurs involve purchases of gasoline, hotel rooms, or meals at restaurants. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it could be three calendar days, or even longer in some cases, before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, you will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

**Payment order of items** – The order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented. The payment order can affect the number of items overdrawn or return unpaid and the amount of the fees you may have to pay. To assist you in managing your account, we are providing you with the following information regarding how we process those items.

Our policy is to process items presented in a branch first, in the order they are received on the day they are processed. We process ATM transactions second, in the order they are received on the day they are processed. We process Electronic transactions third, in the order they are received on the day they are processed. We process Checks fourth, by serial number order on the day they are processed.

If a check, item or transaction is presented without sufficient funds in your account to pay it, you will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. . . . We encourage you to make careful records and practice good account management. This will help you to avoid creating items without sufficient funds and potentially incurring the resulting fees.

{¶ 40} Appellants contend that the 2020 Agreement is materially the same as the 2018 Agreement, only pointing out that the 2020 Agreement's explanation of the "available balance" calculation is confusing and does not support Civista Bank's interpretation regarding the assessment of NSF Fees on APPSN transactions. After recognizing the "available balance" language, appellants simply argue "this case has nothing to do with which balance the Bank uses to assess overdraft fees. Indeed, the 2020 contract, like the 2018 language, contains all the same core provisions, discussed *supra*, which are material to Appellants' claims." Appellants, therefore, raise no new arguments relative to the 2020 Agreement.

{¶ 41} Consequently, for the same reasons discussed above relative to the 2018 Agreement, the trial court did not err when it rejected appellants' APPSN theory and determined that Civista Bank acted in accordance with the 2020 Agreement when it assessed the NSF Fees.

22.

{¶ 42} Accordingly, because summary judgment for Civista Bank was appropriate on appellants' breach of contract claims under the APPSN theory, their first assignment of error is not well-taken.

**Multiple Fee Theory**

{¶ 43} In their second and third assignments of error, appellants challenge the trial court's judgment regarding their breach of contract claims under the multiple fee theory.

**2020 Agreement**

{¶ 44} At the outset, in their second assignment of error, appellants argue that the trial court erred when it granted summary judgment on their claim for breach of the 2020 Agreement under the multiple fee theory. Appellants contend that summary judgment was inappropriate because they, in fact, did not present a claim for breach of the 2020 Agreement under the multiple fee theory. They insist that the claim was limited solely to the 2018 Agreement. Notably, Johnson's complaint limited the putative class to "All Ohio citizens who, during the applicable statute of limitations *up until the time when Civista amended its fee schedule to disclose the practice*, were charged more than one NSF on the same item ("Multi NSF class")." (Emphasis added.).

{¶ 45} For this court to reverse the trial court's judgment, there must be prejudicial error. *See* R.C. 2309.59 ("If the reviewing court determines and certifies that, in its opinion, substantial justice has been done to the party complaining as shown by the record, all alleged errors or defects occurring at the trial shall be deemed not prejudicial to the party complaining and shall be disregarded, and the final judgment or decree under

23.

review shall be affirmed . . ..”); *Hayward v. Summa Health Sys.*, 2014-Ohio-1913, ¶ 24; App.R. 12(D) (“In all other cases where the court of appeals *finds error prejudicial to the appellant*, the judgment or final order of the trial court shall be reversed and the cause shall be remanded to the trial court for further proceedings.”  (Emphasis added.)). Accepting appellants’ argument that there was no claim for breach of the 2020 Agreement under the multiple fee theory, we hold that the trial court’s judgment in favor of Civista Bank on the nonexistent claim is necessarily not prejudicial.

{¶ 46} Accordingly, appellants’ second assignment of error is not well-taken.

### 2018 Agreement

{¶ 47} In their third assignment of error, appellants argue that the 2018 Agreement is ambiguous on whether it permits Civista Bank to charge an NSF Fee each time an electronic order to withdraw is re-presented.  They contend that although “item” is never expressly defined, it is reasonably understood to refer to a customer’s single order or instruction for payment, not subsequent reprocessing attempts between the merchant and the bank.  Thus, when combined with Civista Bank’s promise to charge one fee “per item,” it presents a logical reading that “the $35 fee correlates to one item, and not each time the same item is represented.”

{¶ 48} Contrary to appellants’ argument, the 2018 Agreement does not promise to charge one fee “per item” rejected for insufficient funds.  Further, and more importantly, it cannot be construed to limit the definition of “item” to exclude subsequent reprocessing attempts between the merchant and the bank.

24.

**{¶ 49}** Relevant here, the 2018 Agreement provides,

## CIVISTA BANK
## CHECK PROTECT
## CUSTOMER OVERDRAFT POLICY

An insufficient balance can result from several events, such as: (1) the payment of checks, electronic funds transfers or other withdrawal requests; (2) payments authorized by you; (3) the return of unpaid items deposited by you; (4) bank services charges; or (5) the deposit of items which, according to the bank's Funds Availability Policy, are treated as not yet available or finally paid. We are not obligated to pay any item presented for payment if your account does not contain sufficient funds.
. . .

In the normal course of business, we generally pay items presented in a branch (over the counter transactions) or at an ATM first, then electronic transactions and then checks in serial number order, per the bank's policy. We reserve the right to change the order of payment without prior notice at any time to you or if we suspect fraud or possible illegal activity affecting your account. Also, please be aware that the order of item payment may create multiple overdraft items during a single banking day for which you will be charged our Non-Sufficient Funds (NSF) item paid fee of $35 for each overdraft item paid.

. . . Normally, we will not approve an overdraft for you in excess of the predetermined amount assigned to your account type. So as not to exceed your limit, please note that the amount of the overdraft plus the bank's NSF item paid fee of $35 per item will be deducted from the overdraft limit.

We may refuse to pay an overdraft item at any time even though we may have previously paid overdrafts for you. For example, we typically do not pay overdraft items if your account is not in good standing as defined above, or if based upon our review of your account management, we determine that you have too many overdrafts or are using Check Protect as a regular line of credit. You will be charged an NSF item returned unpaid fee of $35 for each item returned.
. . .

Please note that your Check Protect limit may be available for covering overdrafts created at the teller window, Online Banking and Telephone Banking. The Check Protect limit may also be available for ATM or one-time debit card transactions if you have authorized us to do so. The Available Balance is your current balance plus your Check Protect

25.

limit, which are considered overdraft funds.  Using your Available Balance will create an NSF item paid fee of $35 per item. . .

**CIVISTA BANK**
**CONSUMER SCHEDULE OF FEES**
**The following charges may be assessed against your account if any apply.**
. . .
Non-Sufficient funds (NSF) item paid ……………….……$ 35.00
Non-sufficient funds (NSF) item returned un-paid …..…….$ 35.00
>       An overdraft or non-sufficient funds (NSF) may occur on an account by check, in person or ATM withdrawal or by other electronic means.

**{¶ 50}** As the agreement sets forth, "per item" is only used twice, both in the context of an overdraft item that is paid:  "the bank's NSF *item paid fee of $35 per item* will be deducted;" "Using your Available Balance will create *an NSF item paid fee of $35 per item*."  This is entirely logical since a transaction into insufficient funds that the bank nonetheless elects to pay is satisfied and cannot be re-presented.  In contrast, where the 2018 Agreement refers to presented items that are returned unpaid it uses expansive language such as "any" and "each:"  "We are not obligated to pay *any item presented for payment* if your account does not contain sufficient funds;" "You will be charged *an NSF item returned unpaid fee of $35 for each item returned*."  The expansive language clearly states that each item that is returned unpaid is subject to a $35 fee.

**{¶ 51}** The issue, then, is what constitutes an "item."  The 2018 Agreement does not provide a definition.  As appellants recognize, the common or ordinary meaning of "item" in this context is "A negotiable instrument or order to pay money handled by a bank for collection or payment."  ITEM, Black's Law Dictionary (12th ed.2024).

26.

Appellants equate this definition to "an order by the accountholder to pay—not a third party's resubmission of a previous payment request." Their attempt to restrict the definition of "item" to the specific order to pay created by the accountholder irrespective of its presentment to the paying bank, however, is contrary to the common definition of the term "item" and its use in the 2018 Agreement. To the contrary, "item" refers to the negotiable instrument or order to pay that is "handled by a bank for collection or payment."

{¶ 52} In essence, appellants view an "item" from the perspective of a consumer interacting with a merchant or other third party. Thus, to them, an "item" is a single check that is written or a single ACH authorization. Consequently, they argue that if an accountholder writes a single check, he or she should only ever be charged one NSF item return unpaid fee even where that same check is re-presented for payment and is returned unpaid for a second or third time. But nothing in the 2018 Agreement supports using the term "item" in this way.

{¶ 53} Instead, where the 2018 Agreement uses the term "item," it does so in the context of the negotiable instrument or order to pay that is presented to the bank. The agreement is always framed from the perspective of the bank settling transactions and paying funds out of the consumer's account. It is not directly concerned with the consumer's transaction with the merchant or other third party. "Item," therefore, is whatever is presented to the bank for payment on any particular day, regardless of whether it is being presented for the first, second, or third time. This is consistent with

27.

the agreement's focus, as described above, on presentment being the time when a decision to pay an item, or reject it as unpaid, is made.

{¶ 54} The dissent contends that this interprets "items" according to the norms of banking procedures, rather than from the perspective of a banking customer. It is not the "norms of banking procedures" that drives the interpretation, however, but the context of how the term is used in the agreement. On this point, while the dissent is correct that a customer would necessarily read the banking contract from the perspective of a banking customer, doing so does not permit the customer to replace the definition of the language used in its context in the agreement with his or her expectations from everyday experiences.

{¶ 55} This is the same flaw that is present with appellants' and the dissent's interpretation of the word "pay." A person may say in his or her everyday experience that he or she "pays" for a candy bar when the debit card is swiped at the merchant. But the 2018 Agreement does not use "pay" in that context, and instead uses it in the context of Civista Bank paying the item when it is presented.

{¶ 56} Here, "item" is used in the context of what is presented to Civista Bank. It is not used in the context of the specific thing that a customer gives to a third party, whether it is a particular check, debit card swipe, or other payment authorization.

{¶ 57} Therefore, the only reasonable interpretation of the language contained in the 2018 Agreement is that "item" refers to any negotiable instrument or order to pay that is presented to Civista Bank for payment on a particular day, regardless of whether it is

28.

being presented for the first, second, or third time. Furthermore, because the 2018 Agreement provides that consumers "will be charged an NSF item returned unpaid fee of $35 for each item returned," it unambiguously allows for the multiple fees imposed against Johnson.

{¶ 58} As with their APPSN theory, appellants cite numerous decisions from various other state appellate and trial courts, federal appellate and trial courts, and from five Ohio trial courts. Again, however, those decisions applied the same logic advanced by appellants and rejected above. And while they analyzed conceptually similar contractual language, we do not find them persuasive relative to the specific, unambiguous language in this case.

{¶ 59} Appellants also cite Federal Deposit Insurance Corporation guidance that cautioned that failure to disclose material information to customers about re-presentment practices and fees may be deceptive. In this case, however, the 2018 Agreement unambiguously states that consumers will be charged a $35 fee for each item returned.

{¶ 60} Finally, we note that both parties comment on the National Automated Clearing House Association ("NACHA") rules that were incorporated into the 2018 Agreement. Civista Bank argues that the rules support the interpretation that it can charge NSF Fees each time an item is presented or re-presented and returned unpaid. Appellants, on the other hand, argue that the NACHA rules are a red herring. In this case, however, Civista Bank did not provide the rules as evidence in support of their

29.

motion for summary judgment and they are nowhere to be found in the record. Therefore, we do not consider them for purposes of our analysis.

{¶ 61} In sum, we hold that the trial court did not err when it rejected appellants' multiple fee theory and determined that Civista Bank acted in accordance with the 2018 Agreement when it assessed the NSF Fees.

{¶ 62} Accordingly, appellants' third assignment of error is not well-taken.

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

{¶ 63} In their fourth assignment of error, appellants argue that the trial court erred when it granted summary judgment to Civista Bank on their claim that the bank breached the implied covenant of good faith and fair dealing.

{¶ 64} In *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 43, the Ohio Supreme Court stated that it has "rejected the contention that a party breaches the implied duty of good faith and fair dealing merely by seeking to enforce the contract or by acting as permitted by its express terms." "Thus, there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." *Id.*

{¶ 65} Here, Civista Bank acted in accordance with the unambiguous terms of the 2018 and 2020 Agreements when it imposed the NSF Fees against appellants. Therefore, Civista Bank did not breach the implied duty of good faith and fair dealing, and the trial court did not err when it awarded summary judgment in favor of the bank on that claim.

30.

**{¶ 66}** Accordingly, appellants' fourth assignment of error is not well-taken.

### Unjust Enrichment

**{¶ 67}** Finally, in their fifth assignment of error, appellants argue that the trial court erred when it granted summary judgment to Civista Bank on their claims for unjust enrichment.

**{¶ 68}** "Unjust enrichment is an equitable claim based on a contract implied in law . . . the purpose of which 'is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant." (Internal citation omitted.) *Bunta v. Superior Vacupress, L.L.C.*, 2022-Ohio-4363, ¶ 36, citing *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335 (1954). "Generally, Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject matter." *Id.*; *Donald Harris Law Firm v. Dwight-Killian*, 2006-Ohio-2347, ¶ 14 (6th Dist.) ("Absent fraud or illegality, a party to an express agreement may not bring a claim for unjust enrichment.").

**{¶ 69}** In this case, appellants claimed that Civista Bank was unjustly enriched when it retained the funds from the NSF Fees. Because, however, the imposition of NSF Fees was expressly provided for in the unambiguous agreements, and because appellants have not produced any evidence to demonstrate fraud, illegality, or bad faith, their claim for unjust enrichment must fail as a matter of law. Accordingly, the trial court did not err when it granted summary judgment in favor of Civista Bank on appellants' unjust enrichment claims.

31.

**{¶ 70}** Accordingly, appellants' fifth assignment of error is not well-taken.

## Conclusion

**{¶ 71}** For the foregoing reasons, we find that substantial justice has been done the parties complaining. The judgment of the Erie County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.
_____
JUDGE

Myron C. Duhart, J.
_____
JUDGE

Christine E. Mayle, J.
DISSENTS AND WRITES
SEPARTELY.

**MAYLE, J., Dissenting**

**{¶ 72}** Respectfully, I dissent. The majority concludes that Civista Bank's contracts "unambiguously" disclosed its authority to charge two types of fees: (1) overdraft fees on debit-card transactions that were authorized while the customer's bank account was positive but purportedly settled when the accounts were negative ("APPSN" transactions), and (2) multiple non-sufficient funds fees ("NSF Fees") on the same

32.

electronic transactions or checks when reprocessed again after initially being returned for insufficient funds. I disagree with this conclusion.

{¶ 73} Although the majority sets forth *a* reasonable interpretation of the relevant contracts, the average consumer—even when reading the agreements carefully—would struggle to discern that the bank reserves the right to charge these specific types of fees. Rather than explaining its fee policies in plain English, Civista Bank requires customers to sift through confusing and opaque language scattered across various parts of the contracts. In my view, the lack of a clear, cohesive explanation of the relevant banking processes and fee practices—combined with the use of confusing, and sometimes contradictory, language relating to those processes and practices—leaves the documents open to multiple reasonable interpretations.

**1. Fees for APPSN transactions under the 2018 Agreement**

{¶ 74} Appellants argue that Civista Bank breached the 2018 Agreement by charging overdraft fees for APPSN transactions. The 2018 Agreement states that Civista Bank would place an immediate "hold" upon the amount charged (and, sometimes, more than the amount charged). Appellants believed that this "hold" would ensure sufficient funds to cover the debit-card transaction when it eventually settled. According to the appellants, although the contract states that the "hold" could result in overdraft fees for *other* transactions, there is nothing that states—in clear and unambiguous terms—that the initial transaction *itself* could be subject to overdraft fees even if the charge was authorized when the account contained sufficient funds.

33.

{¶ 75} The relevant contractual notification states:

**A temporary debit authorization hold affects your account balance—** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

{¶ 76} In their brief, appellants argue that "[a] reasonable customer's understanding of the term 'hold' is critical here." I agree. A reasonable customer would most likely interpret this provision using the common and ordinary definition of "hold"— i.e., "full or immediate control: POSSESSION." *Merriam-Webster's Collegiate Dictionary* (10th Ed. 1996). That is, a reasonable consumer would likely believe that the bank would take "full or immediate control: POSSESSION" of the funds necessary to cover a debit-card transaction—especially since this provision also states that (1) the temporary hold results in an "amount *charged to* your account"; (2) "the amount of funds in your account available for other transactions *will be reduced* by the amount of the temporary hold" and (3) "the temporary hold amount" would be "*deduct[ed]*" from the customer's account. (Emphasis added.) Overall, this provision gives the distinct

34.

impression that the bank would take immediate control or possession of sufficient funds to satisfy the pending debit transaction.

{¶ 77} Indeed, this provision unambiguously explains that the "held" funds *would not be available* to satisfy any subsequent transactions when it says:

> If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it.

Moreover, this provision notifies the customer that NSF or overdraft fees could be imposed upon "*another* transaction"—i.e., a different and subsequent transaction—if "*that* transaction" exceeds the available balance during the temporary hold period, as explained in the following detailed example:

> Here is an example of how this can occur – assume for this example the following: (1) you have opted-in to our overdraft services for the payment of overdrafts on ATM and everyday debit card transactions, (2) we pay the overdraft, and (3) our overdraft fee is $35 per overdraft, but we do not charge the overdraft fee if the transaction overdraws the account by less than $10.
> You have $120 in your account. You swipe your card at the card reader on a gasoline pump. Since it is unclear what the final bill will be, the gas station's processing system immediately requests a hold on your account in the amount of $80, and the gas station's processing system authorizes you to begin pumping gas. You fill your tank and the amount of gasoline you purchased is only $50. Our processing system shows that you have $40 in your account available for other transactions ($120 - $80 = $40) even though you would have $70 in your account available for other transactions if the amount of the temporary hold was equal to the amount of your purchase ($120 - $50 = $70). Later, *another transaction* you have authorized is presented for payment from your account in the amount of $60 (this could be a check you have written, another debit card transaction, an ACH debit or any other kind of payment request). This *other transaction* is presented before the amount of the temporary hold is adjusted to the amount of your purchase (remember, it may take up to three

35.

days for the adjustment to be made). Because the amount of this *other transaction* is greater than the amount our processing system shows is available in your account, our payment of *this transaction* will result in an overdraft transaction. Because the transaction overdraws your account by $20, your account will be assessed the overdraft fee of $35 according to our overdraft fee policy. You will be charged this $35 fee according to our policy even though you would have had enough money in your account to cover the $60 transaction if your account had only been debited the amount of your purchase rather than the amount of the temporary hold or if the temporary hold had already been adjusted to the actual amount of your purchase. (Emphasis added.)

{¶ 78} While Civista Bank goes to great lengths to explain that the temporary "hold" could result in NSF or overdraft fees on *other transactions*, the contract does not contain any language that clearly and unambiguously notifies the customer that the *original* debit-card transaction could *also* incur NSF fees due to the timing and operation of the temporary hold.

{¶ 79} Civista Bank argues that this explanation can be found by piecing together other parts of the 2018 Agreement regarding the timing and order of "payments" generally. The bank argues that appellants should have known that a temporary authorization hold could result in fees upon the original transaction because (1) the agreement, in various places, refers to NSF Fees being determined at the time the "item" is "presented for payment," which it claims is distinct from the time of "authorization;" (2) the agreement warns that "[a]n insufficient balance can result from several events," and states that the bank does not have to pay for "any item presented for payment" if the account contains insufficient funds; and (3) the agreement specifies an "order of payment" for all "items," which necessarily encompasses the debit-card transactions—

36.

meaning that the timing of "payments" could result in insufficient funds for debit-card transactions and, therefore, fees.

{¶ 80} While these arguments present *a* reasonable interpretation of the agreement, appellants point out several ambiguities and contradictions within these various provisions.

{¶ 81} First, the key terms relied upon by the bank are undefined and ambiguous. Civista Bank's argument assumes, as a foregone conclusion, that an "item"—as used in the overdraft provisions and fee schedule quoted by the majority—clearly includes a debit-card "transaction." But "item" is not defined anywhere in the contract, which opens the door to ambiguity—especially when "item" is not used in a consistent way throughout the agreement.

{¶ 82} The agreement repeatedly uses "item" in reference to the physical handling of checks, including endorsement, deposit, and forgery—actions that do not apply to debit card transactions. For example, the "DEPOSITS" section states "[w]e may reverse any provisional credit for items that are lost, stolen, or returned"; and "[w]e also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you…which is later returned to us due to an allegedly forged, unauthorized or missing endorsement, claim of alteration, encoding error or other problem." And the "ENDORSEMENTS" section states "[w]e may accept for deposit any item payable to you or your order... You must endorse it (sign it on the back) in a specific area."

37.

{¶ 83} Conversely, when addressing debit card activity, the agreement shifts terminology. The paragraph addressing the impact of holds on debit-card transactions—which is the most important paragraph for purposes of the APPSN issue—refers only to "transactions," and does not use the term "item" *at all*.

{¶ 84} Given the contract's deliberate use of "item" in one context but not the other, a consumer could reasonably interpret an "item" as something tangible, such as a check or negotiable instrument, rather than an intangible, electronic debit transaction. This interpretation comports with the common understanding of the term as well. *See Merriam-Webster's Collegiate Dictionary* (10th Ed. 1996) (defining "item" to include "an object of attention, concern, or interest.").

{¶ 85} The phrase "presented for payment" is similarly undefined and ambiguous. A typical customer would likely interpret "presented for payment" as referring to the moment they "present" their debit card to "pay" for a transaction—especially since that is when the customer is informed that the transaction has been approved and funds placed on "hold" to cover it. *See Roberts v. Capital One, N.A.*719 F. Appx. 33, 37 (2d Cir. 2017) ("A reasonable consumer likely considers something to have been paid for when they swipe their debit card, not when their bank's back-office operations are completed."). Although the majority concludes that this term "must mean when the transaction actually settles and funds are transferred by Civista Bank from the customer's account," the typical bank customer does not possess specialized knowledge regarding

38.

how the banking industry processes debit-card transactions in multiple stages. And, importantly, this multi-stage process is not clearly explained within the contract itself.

{¶ 86} In addition, appellants point to the following language as contradicting the various provisions relied upon by the bank:

> **Overdrafts-** You understand that we may, at our discretion, *honor withdrawal requests that overdraw your account*. However, the fact that we may *honor* withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you….

(Emphasis added). Appellants argue that this provision states that overdrafts occur when the bank determines whether to "honor withdrawal requests"—which a reasonable customer would interpret to mean the moment he or she initiates a debit-card transaction and the bank "honors" the request by placing a "hold" on the account. Although there is language in the contract supporting the bank's interpretation, nothing in the contract unambiguously explains how the "authorization" and "settlement" process could result in fees for transactions that the bank has already "honored." It is therefore reasonable for a customer to read this provision and believe that the bank would "honor" its authorization decision for fee purposes.

{¶ 87} Indeed, several other courts have found similar language to be open to multiple reasonable interpretations. In *Precision Roofing of N. Florida, Inc. v. Centerstate Bank*, 2021 WL 3036354 (M.D. Fla. Feb. 22, 2021), the court interpreted a contract provision identical to this one. The court found that this clause "can be read to

39.

only authorize overdraft fees when Defendant 'honors'—i.e., authorizes—a withdrawal request that overdraws the account," and that the bank's interpretation that "an overdraft fee [is] imposed when Defendant 'pays'—i.e. settles—a withdrawal request, is also reasonable." *Id.* at *4. Similarly, in *Gardner v. Flagstar Bank, FSB*, 2021 WL 3772866, *5-*6 (E.D. Mich. Aug. 23, 2021), the court found that the contract's repeated reference to "payment" of an "item" did not unambiguously notify the customer that overdraft fees would be assessed at settlement versus authorization for APPSN transactions, given that the contract also provided that the bank may "honor withdrawal requests that overdraw your account." *See also Hash v. First Financial Bancorp*, 2021 WL 859736, *5 (S.D. Ind. March 8, 2021) (finding a similar contract provision[5] that used the terms "honor," "authorize," and "pay" in a seemingly synonymous way was ambiguous because it "doesn't help the customer understand whether overdrafts are determined at the time of authorization or settlement.")

{¶ 88} In sum, appellants' reasonable interpretation of the 2018 Agreement creates ambiguity in the face of conflicting provisions, relied upon by Civista Bank, regarding the "payment" of "items" that are "presented for payment"—which, as I've explained, is less than clear due to the confusing and inconsistent use of those terms. The bank's

---

[5] The contract at issue in *Hash* stated: "You understand that we may, at our discretion, *honor* withdrawal requests that overdraw your account as part of our Courtesy Cash service. However, we will only authorize and pay overdrafts for ATM transactions or debit transactions if you specifically opted-in to Courtesy Cash Plus service, or there are available funds at the time of authorization." *Hash* at *5.

40.

arguments require an understanding of the banking process of "authorization" and "settlement" of debit-card transactions—and that process is not clearly explained anywhere in the contract.

{¶ 89} Because the contract is ambiguous, I would find a question of fact precludes summary judgment on the issue of whether the 2018 Agreement allowed Civista Bank to charge overdraft fees for APPSN transactions.

**2. Fees for APPSN transactions under the 2020 Agreement.**

{¶ 90} Appellants argue that Civista Bank also breached the 2020 Agreement by charging overdraft fees for APPSN transactions, and claims that "[t]he 2020 language is materially the same as the 2018 language."[6]  I agree that the two agreements have materially similar language on this issue.  Although the 2020 Agreement does not contain the extensive "gas station" example—which provides additional explanation regarding the possibility of fees on *other* transactions during the temporary debit-card hold period due to overestimated holds—the 2020 Agreement is otherwise similar to the 2018 Agreement in all material respects.

{¶ 91} Like the 2018 Agreement, "item" is undefined, and subject to multiple reasonable interpretations.  In addition, the 2020 Agreement contains new language that adds to the confusion by distinguishing between "debit card transactions," "electronic transactions," and "items" in different parts of the document.  For example, the overdraft section states:

---

[6] Most of the relevant language from the 2020 Agreement, with the exception of the "overdraft" provision, is quoted by the majority at paragraph 39.

41.

> Our policy is to process items presented in a branch first, in the order they are received on the day they are processed. We process ATM transactions second, in the order they are received on the day they are processed. We process Electronic transactions third, in the order they are received on the day they are processed. We process Checks fourth, by serial number order on the day they are processed.

{¶ 92} This sentence could be interpreted to mean that "items" are separate from "transactions." Likewise, this same provision goes on to state:

> If a check, item or transaction is presented without sufficient funds in your account to pay it, you will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy.

This language implies that an "item" is distinct from both a check and a "transaction." And, like the 2018 Agreement, the most important clause for the APPSN issue— "A temporary debit authorization hold affects your account balance"—does not use the term "item" *at all*.

{¶ 93} Moreover, the substance of that clause is essentially the same in both agreements. Like the 2018 Agreement, the 2020 Agreement repeatedly references a temporary "hold"—which is commonly defined as "full or immediate control: POSSESSION" *Merriam-Webster's Collegiate Dictionary* (10th Ed. 1996)—and similarly states:

- "If *another transaction* is presented for payment in an amount greater than the funds left after *the deduction* of the temporary hold amount, you will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy"—which can reasonably be interpreted as (1) a specific warning regarding the possibility of fees charged on "another transaction" due to the hold, and (2) a statement that the "funds" would actually be "deducted" from the account;

42.

- The temporary hold results in an "amount *charged to* your account";

- "[T]he amount of funds in your account available for other transactions *will be reduced* by the amount of the temporary hold."

{¶ 94} All of which, as described above, can be reasonably interpreted to mean that Civista Bank would actually "hold" the funds to cover the debit transaction. Although the contract expressly notifies the customer that fees may be incurred on *other* transactions during the hold period, there is nothing within the relevant clause that explains how the "authorization" and "settlement" process could cause the customer to incur an overdraft fee on the *original* transaction even if the account had sufficient funds to cover the debit-card transaction at the time it was made.

{¶ 95} Unlike the 2018 Agreement, however, the 2020 Agreement adds an additional clause regarding the "available balance" method:

> **Determining your available balance** – We use the "available balance" method to determine whether your account is overdrawn, that is, whether there is enough money in your account to pay for a transaction. Importantly, your "available" balance may not be the same as your account's "actual" balance. This means an overdraft or an NSF transaction could occur regardless of your account's current balance.
>
> Your account's current balance (sometimes called the ledger balance) only includes transactions that have settled up to that point in time, that is, transactions (deposits and payments) that have posted to your account. The current balance does not include outstanding transactions (such as checks that have not yet cleared and electronic transactions that have been authorized but which are still pending). The balance on your periodic statement is the ledger balance for your account as of the statement date.
>
> Your available balance is calculated based on the money "available" in your account to make payments. The available balance takes transactions that have been authorized, but not yet settled, and subtracts them from the current balance. In addition, when calculating your available balance, any "holds" placed on deposits that have not yet cleared are also

43.

subtracted from the current balance. For more information on how holds placed on funds in your account can impact your available balance, read the subsection titled "A temporary debit authorization hold affects your account balance."

But as appellants argue, there is nothing in this paragraph that lends any clarity to the situation given that it contains an obtuse definition for "available balance" ("[y]our available balance is calculated based on the money 'available' in your account to make payments") and uses "available balance," "actual balance," "current balance," "ledger balance," and "balance on your period statement" in confusing, and sometimes interchangeable, ways. I agree that this paragraph is ambiguous and circular. Rather than explain *how* a "temporary debit authorization hold" could impact the "available balance" in a way that results in fees upon the initial transaction—even if authorized when positive—it merely references the "temporary debit authorization hold" paragraph for further explanation. And, as discussed, that paragraph contains no such explanation.

{¶ 96} Civista Bank argues, however, that this provision "clearly" explains "*what* the available balance is ('The money available in your account to *pay* for a transaction')", and other provisions "clearly" explain "*when* fees can be assessed on an account (at payment: 'The payment order can affect the number of items overdrawn or returned unpaid and the amount of fees you may have to Pay…')". As I explain when analyzing the 2018 Agreement, however, the same provisions of the 2020 Agreement that are relied upon by the bank—i.e., provisions that reference the timing and order in which "items" that are "presented for payment" are "paid" by the bank—are ambiguous and subject to multiple, reasonable explanations. Despite the bank's interpretation of these provisions,

44.

there is no *clear* explanation of the "authorization" and "settlement" process that would preclude a customer from interpreting the contract, as a whole, to mean that the sufficiency of funds (and, therefore, the determination of fees) is evaluated at the moment they "pay" for something—that is, swipe their card and see the purchase approved.

{¶ 97} Indeed, the 2020 Agreement contains the same "overdraft" provision, stating that "[y]ou understand that we may, at our discretion, *honor withdrawal requests that overdraw your account*." (Emphasis added). Again, this language implies that an account may become "overdraw[n]" (and, therefore, subject to overdraft fees) at the moment the bank decides to "honor"—i.e., authorize—a "withdrawal request." Thus, from the consumer's perspective, it is reasonable to believe that Civista Bank retroactively reclassified sufficient transactions as overdrafts when it imposed fees on APPSN transactions. While Civista Bank does present a reasonable alternative interpretation of the contract, the bank's interpretation is not the **only** reasonable interpretation. Thus, summary judgment is not appropriate.

{¶ 98} For these reasons, the 2020 Agreement does not unambiguously disclose the bank's authority to charge overdraft fees for APPSN transactions. I would, therefore, find a question of fact precludes summary judgment on the issue of whether the 2020 Agreement allowed Civista Bank to charge overdraft fees for APPSN transactions.

### 3. Multiple fees under the 2018 Agreement

{¶ 99} Johnson claims that Civista Bank breached the 2018 Agreement by imposing NSF fees each time a single "item" is presented, and then re-presented, for

45.

payment by a merchant.  He points to the "Customer Overdraft Policy," which repeatedly refers to the imposition of NSF fees "per item."  That is, the policy states: "[s]o as not to exceed your limit, please note that the amount of the overdraft plus the bank's NSF item paid fee of $35 *per item* will be deducted from the overdraft limit," and "[t]he Available Balance is your current balance plus your Check Protect limit, which are considered overdraft funds.  Using your Available Balance will create an NSF item paid fee of $35 *per item*." (Emphasis added).  In addition, the "Consumer Schedule of Fees" provides the following:

> Non-Sufficient funds (NSF) item paid ………………..……$ 35.00
> Non-sufficient funds (NSF) item returned un-paid …..……..$ 35.00
>     An overdraft or non-sufficient funds (NSF) may occur on an account by check, in person or ATM withdrawal or by other electronic means.

The term "item" is not defined in the contract, and Johnson argues that "item" should be interpreted according to its ordinary usage—i.e., a single order or instruction for payment from his or her account.

{¶ 100} In its brief, Civista Bank argues that Johnson's interpretation is unreasonable because other parts of that same Policy refer to fees on "each" item, and given that "each" is a "word of inclusion," the contract is therefore clear that "Johnson may be charged an NSF fee *each and every* time a balance is insufficient to cover the debit, up to three times total."  In support, the bank points to contract language stating: "please be aware that the order of item payment may create multiple overdraft items during a single banking day for which you will be charged our Non-Sufficient Funds

46.

(NSF) item paid fee of $35 for *each* overdraft item paid," and "[y]ou will be charged an NSF item returned unpaid fee of $35 for *each* item returned." (Emphasis added).

{¶ 101} The majority finds that the bank's interpretation is the "only reasonable interpretation" because (1) "item" is undefined, and must be interpreted according to its "common or ordinary" meaning as "[a] negotiable instrument or order to pay money handled by a bank for collection or payment," Black's Law Dictionary (12th Ed. 2024); (2) this definition of "item" must be read "from the perspective of the bank settling transactions and paying funds out of the consumer's account" and *not* "from the perspective of a consumer interacting with a merchant or other third party[,]" and (3) because a single "item" may be "handled by a bank for collection or payment" on multiple occasions, the contract "unambiguously allows for the multiple fees imposed against Johnson." I disagree for several reasons.

{¶ 102} First, much like Civista Bank's arguments relating to the propriety of fees on APPSN transactions, its interpretation of the "multiple fee" issue requires a certain level of familiarity with banking procedures that are not clearly explained within the contract itself. While the possibility for multiple "presentations" of a single "item" is certainly alluded to in the contract, the resubmission process *itself* is not explained in a clear and unambiguous manner. Given this ambiguity, a factual issue exists regarding whether a typical customer, upon reading the 2018 Agreement, would reasonably understand that a single check or debit transaction could be resubmitted multiple times for payment by a merchant, rather than simply being declined once for insufficient funds.

47.

{¶ 103} Second, the agreement does not state that the contract language must be interpreted according to the norms of banking procedures—which, again, are not clearly explained within the document itself—rather than from "the perspective of a consumer." Indeed, it is axiomatic that a consumer would *necessarily* read a banking contract from "the perspective of a consumer." Consumers interact with their bank accounts through everyday transactions—writing checks, swiping debit cards, or authorizing payments— without insight into the unseen processing mechanics. It is reasonable for consumers to interpret contract terms based on the practical context in which they experience them, rather than behind-the-scenes protocols that are not explained—in unambiguous terms— within the contract itself.

{¶ 104} Third, as I discuss above, the term "item" is undefined, ambiguous, and subject to multiple reasonable interpretations. The majority recognizes that "item" is undefined, but notes that it is commonly defined as "[a] negotiable instrument or order to pay money handled by a bank for collection or payment." ITEM, Black's Law Dictionary (12th ed. 2024). Even so, given the absence of clear contract language to the contrary, it is reasonable for consumers to interpret the Black's Law definition of "item" in a manner consistent with how such transactions appear to function in real life, rather than the internal workings of the banking system. That is, from the consumer's perspective, "a negotiable instrument" can reasonably mean a single check written by the consumer, and "order to pay" can reasonably mean the initial transaction that they "ordered" the bank "to pay" with their debit account.

48.

{¶ 105} Simply put, the contract does not contain an unambiguous explanation that the same check or debit transaction could be a separate and distinct "item" for purposes of NSF fees. Although there are contractual terms that could be reasonably interpreted to provide this notification, there are certainly reasonable interpretations to the contrary from "the perspective of a consumer." Although Civista Bank relies upon portions of the contract that reference the imposition of NSF fees for "each" item, I find this argument to be unpersuasive "because the ambiguity here pertains to what qualifies as an 'item' to begin with, not whether NSF fees may be incurred for 'each' of them." *Chambers v. HSBC Bank USA, N.A.*, 2020 WL 7261155, *4 (S.D.N.Y. Dec. 10, 2020) (finding a banking contract with similar language to be ambiguous regarding whether a transaction was a new "item" subject to NSF fees each time it was returned for insufficient funds and reprocessed).

{¶ 106} Many federal courts have found banking contracts with similar—and, sometimes, more explicit—language to be ambiguous as to whether the contracts permit NSF fees to be assessed each time an "item" is presented for payment. *See e.g.*, *Grant v. Centerstate Bank*, 2021 WL 9594008, *3 (M.D. Fla. July 6, 2021) (finding contract that disclosed "a $35.00 overdraft fee for each item presented against insufficient funds" and a $35 "[o]verdraft/NSF Charge (per item)" was ambiguous, and plaintiff's interpretation that "the $35 NSF fee may be assessed once 'per item—not *each time* an 'item' is processed and returned unpaid" was reasonable); *Encarnacion v. Workers Credit Union*, 2022 WL 16574051, *3 (D. Mass. April 14, 2022) (where agreement stated that "[i]f an

item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item for insufficient funds (NSF)" and "item" was undefined, it was ambiguous and, at a minimum, reasonable to interpret "item" to refer to *plaintiff's* order to the bank to pay money); *Roy v. ESL Federal Credit Union*, 2020 WL 5849297, *8-10 (W.D.N.Y. Sept. 30, 2020) (finding contract allowing the bank to charge "[a]n Overdraft/Insufficient Funds fee" for "each 'insufficient funds' item presented for payment and returned unpaid" was ambiguous because "item" was ambiguous and undefined, and the bank "did not simply say that an OD/NSF fee could be charged 'each time' an item is presented for payment and returned unpaid"); *Abramson v. Affinity Fed. Credit Union*, 2021 WL 3885325, *5-6 (D.N.J. Aug. 31, 2021), quoting *Richard v. Glens Falls Nat'l Bank*, 2021 WL 810218, *11-12 (N.D.N.Y. Mar. 3, 2021) (following the "overwhelming majority of courts" that have found "similar account agreements that allow NSF Fees to be assessed on a 'per item" basis" to be ambiguous in the absence of "a standalone definition for 'item'" or "a 'provision making clear that a separate NSF Fee may be charged for each presentment of the same transaction.'"); *Besser v. Sunflower Bank, N.A.*, 2022 WL 1184895, *2-5 (D. Co. Mar. 31, 2022) (where contract explicitly provided that the customer "may incur a fee for each payment order that is presented against your account when you do not have sufficient available funds," and also provided an "[o]verdraft fee per returned item," the contract was ambiguous because a reasonable consumer could interpret the contract to mean "there is a single payment order—made by the customer to the Defendant—and

50.

thus only a single NSF fee can be imposed"); *Hartnett v. Washington Federal Bank*, 2021 WL 6494953, *3 (W.D. Wash. Dec. 7, 2021) (finding contract ambiguous where it listed an NSF fee "per item" and did not define "item," and finding plaintiff's interpretation—"the item here is the check they wrote to the merchant"—to be reasonable).

{¶ 107} For these reasons, I would join the "overwhelming majority of courts" from other jurisdictions that have found similar contract language regarding NSF fees "per item" to be ambiguous regarding the bank's authority to charge NSF fees each time an item is presented for payment.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

51.